United States District Court
Southern District of Texas
**ENTERED**
February 09, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| WILLIAM CASEY, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:14-CV-13 |
| | § | |
| WILLIAM STEPHENS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this prisoner civil rights action, Plaintiff William Casey challenges certain policies and practices of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID) that he claims conflict with his right to practice his Native American faith in violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq.*, and the First Amendment. Plaintiff seeks injunctive and declaratory relief against the TDCJ-CID, by and through Defendant William Stephens in his official capacity only, to allow Plaintiff to: (1) grow his hair long and/or wear a kouplock;[1] (2) wear his medicine bag at all times; and (3) possess and smoke a personal prayer pipe. (*See* D.E. 1, p. 7).

Pending is Defendant's motion for summary judgment to deny Plaintiff's claims and dismiss them with prejudice. (D.E. 46). Plaintiff has filed a response in opposition

---

[1] A kouplock is a two-inch wide strip of hair at the base of the skull that grows continuously.

(D.E. 51), to which Defendant has filed a reply (D.E. 54), and Plaintiff has filed a sur-reply. (D.E. 57).

For the reasons set forth below, the Court finds that the TDCJ-CID's practices and policies at issue in this lawsuit do impose a substantial burden on Plaintiff's free exercise of his religious beliefs in violation of RLUIPA. However, the Court finds the challenged TDCJ-CID policies and practices are the least restrictive means of providing religious freedom to Plaintiff, while simultaneously maintaining the TDCJ-CID's legitimate penological interests in security and safety within mandated budget constraints. Further, Plaintiff's allegations do not establish constitutional violations under the First Amendment. Consequently, the Court **GRANTS** Defendant's motion for summary judgment and **DISMISSES with prejudice** Plaintiff's claims for injunctive and declaratory relief under RLUIPA and the First Amendment.

## I.    JURISDICTION.

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## II.    PROCEDURAL BACKGROUND.

Plaintiff is a prisoner in the TDCJ-CID, and is currently confined at the McConnell Unit in Beeville, Texas. Plaintiff has been in TDCJ custody since 1994; he is serving an eighty-year sentence for aggravated sexual assault of a child, as well as a twenty-year sentence for aggravated sexual assault of a child.

On January 10, 2014, Plaintiff filed his original complaint. (D.E. 1). He named as defendants: (1) William Stephens, the TDCJ-CID Director, and (2) Clint Morris, the Native American Program Analyst. (D.E. 1, p. 3). On March 12, 2014, a *Spears*[2] hearing was conducted, and on March 31, 2014, service was ordered on Stephens and Morris. (D.E. 9).

On May 16, 2014, Defendant Stephens filed his answer (D.E. 11), and Clint Morris filed a Rule 12(b)(6) motion to dismiss. (D.E. 12). By Memorandum and Recommendation (M&R) entered November 13, 2014, United States Magistrate Judge Jason Libby recommended that Morris's Rule 12(b)(6) motion be denied noting that, in other pending Native American-TDCJ-CID lawsuits, Morris had been retained past initial screening, although he had later been granted summary judgment in his favor and all claims against him dismissed with prejudice. (D.E. 20). Morris filed objections to the November M&R, arguing that his defense of qualified immunity entitled him to be free from the burdens of suit, as well as trial. (D.E. 22). An amended recommendation on Morris's qualified immunity defense was ordered, (D.E. 28), and on February 27, 2015, Judge Libby entered a supplemental M&R recommending that the Court find that Morris was entitled to qualified immunity because his job performance did not equate with a constitutional violation. (D.E. 29). On March 27, 2015, the Court adopted the February 2015 M&R and granted Morris's motion to dismiss. (D.E. 36).

---

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

On August 3, 2015, Defendant Stephens filed the instant motion for summary judgment. (D.E. 46). Following an extension of time (D.E. 50), on October 23, 2015, Plaintiff filed his response to the summary judgment motion. (D.E. 51). On December 4, 2015, Defendant filed a reply to Plaintiff's response (D.E. 54), and on December 31, 2015, Plaintiff filed a sur-reply (D.E. 57).

## III.   SUMMARY JUDGMENT EVIDENCE.

### A.   Evidence related to Plaintiff's faith and claims.

Plaintiff is of Cherokee descendant. He has been practicing his Native American faith since 2003, and on November 9, 2003, Plaintiff designated his religious preference with the TDCJ-CID as Native American.[3] (D.E. 46-1, p. 3).

Plaintiff is a minimum custody inmate and lives in a dorm-like setting. Within his living space, he is allowed to possess the following religious items: a medicine bag that contains 1/8 teaspoon each of sage and sweet grass; a headband; a prayer feather; a smudging bowl; and seven (7) stones. He is permitted to practice his faith in his living area, and to wear his medicine bag and headband there, as well as on his way to and from

---

[3] It is acknowledged that neither the term "Native American faith" nor "Native American religion" adequately represents the defined belief system of Plaintiff Casey or any particular Native American practitioner because the faith itself encompasses a wide range of beliefs from different tribes and regions. (*See* Expert Report of Chief Chari Bouse, TDCJ-CID Contract Native American Chaplain, D.E. 46-17, p. 3, noting: "Currently, there are 566 federally recognized tribes. . . . Each tribe has its own specific customs and traditions. However, there are several 'inter-tribal' customs, and even that varies in tribes from different states. Native Americans are not religious by nature, but adhere to what we call a 'way of life.' Our people are monotheistic, meaning we recognize only one Creator God or deity."). A running similarity in the Native American faith system is the central relationship of human beings, and their bodies, to the land, nature, reality, and spirituality. *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 460-61 (1988) (J. Brennan, dissenting).

4

services.  However, he is not permitted to wear his medicine bag while he walks about the prison.  Plaintiff attends Native American educational classes once a week, and religious prayer ceremonies once a month.  Plaintiff is not complaining about the frequency of the prayer ceremonies.

On May 29, 2013, Plaintiff filed a Step 1 grievance, Grievance No. 2013154441, complaining that certain TDCJ's policies were interfering with his ability to exercise his Native American faith.  (D.E. 1, pp. 9-10).  Plaintiff stated that it was one of the tenets of his faith to continually grow his hair and to cut it only in times of mourning as a sign of respect for the deceased, and that the TDCJ's grooming policy requiring short hair trimmed above the ears interfered with this practice, and he sought an exemption from the grooming policy.  *Id.*  Plaintiff alleged further that it was his belief that wearing a medicine bag containing certain sacred items protected him from evil spirits, and he challenged the TDCJ policy that limited his wearing of the medicine bag to his cell area and prayer ceremonies only.  *Id.*  Finally, Plaintiff requested that he be able to smoke his own sacred prayer pipe and offer his own prayers to the Great Spirit rather than have a chaplain offer his prayers by proxy.  *Id.*

On September 20, 2013, Warden Barber denied Plaintiff's Step 1 grievance noting that all offenders must adhere to the grooming policy; he did not address Plaintiff's other claims.  (D.E. 1, p. 10).  On September 29, 2013, Plaintiff filed a Step 2 appeal of Grievance No. 2013154441, noting out that Warden Barber had failed to address his complaints regarding the medicine bag and pipe.  (D.E. 1, pp. 11-12).  On October 28,

2013, Bill Pierce denied Plaintiff's Step 2 appeal, stating that the chaplaincy department could not authorize exemptions to the grooming policy. (DE. 1, p. 12). Again, Plaintiff's claims regarding the medicine bag and prayer pipe were not addressed.

### B.     Evidence related to development of challenged TDCJ policies.

### (1)     The *Yellowquill* case.

On April 13, 1995, Jolene Yellowquill, a Native American of Ojibwe heritage who was confined at a TDCJ unit in Gatesville, Texas, filed suit for injunctive relief in the United States District Court for the Southern District of Texas, Houston Division, seeking, *inter alia,* that the TDCJ be required to provide sacred pipe ceremonies to Native American adherents confined within the TDCJ. *See Yellowquill v. Scott,* Case No. 4:95-cv-1080, D.E. 1, 63.  On May 22, 1997, the district court granted Yellowquill's motion for a temporary restraining order as it related to the communal pipe. *Id.,* D.E. 71. Thereafter, the parties reached a settlement. *Id.,* D.E. 119.  Although *Yellowquill* involved only one inmate, the resulting settlement agreement served as the basis for the TDCJ implementing certain policies to address the practice of the Native American faith.

### (2)     Policies after *Yellowquill* and the *Chance* Litigation.

The TDCJ orientation handbook provides that effective October 13, 1997, all prisons in the TDCJ are tobacco free. *See TDCJ Offender Orientation Handbook,*[4] p. 21 (revised September 2015).  In November 2008, the TDCJ Chaplaincy Department, in response to the *Yellowquill* litigation, revised the Chaplaincy Manual, Policy 09.03 (rev.

---

[4] http://www.tdcj.state.tx.us/documents/Offender_Orientation_Handbook_English.pdf.

4) to create an exception to the TDCJ tobacco ban for Native American believers at pipe ceremonies.[5]  (*See Cox v. Stephens, et al.,* Civil Action No. 2:13-cv-151, D.E. 37-12, pp. 1-4.).

> That policy exception provided in relevant part:

> 3.  TDCJ policy forbids the use or possession of tobacco in prison by offenders.  However, an exception to policy is in effect for Native American religious practitioners participating in the circle group prayer pipe ceremony of Native American-designated units/facilities.
>
> .  .  .
>
> 5.  The Pipe ceremony will be conducted at a rate of no more than twice each month on Native American-designated units/facilities. This is contingent upon availability of a qualified Native American chaplain, or a TDCJ approved volunteer, the pipe ceremony will be supervised and/or facilitated by one of these.
>
> 6.  The pipe ceremony will include tobacco or sage, sweet grass, kinnikinnick, or cedar.  These may be used in combination as prescribed by Native American tradition.

*Id.* (emphasis in original).

On June 16, 2011, William Chance, a Native American prisoner confined at the Michael Unit in Tennessee Colony, Texas, sued the TDCJ and certain prison officials in the United States District Court for the Eastern District of Texas, Tyler Division, alleging that he had been denied, *inter alia,* the right to participate in pipe ceremonies and smudging rituals in violation of RLUIPA and his First Amendment rights.  (*See Chance v. TDCJ,* Case No. 6:11-cv-435 (E.D. Tex. June 16, 2011) (complaint).  Plaintiff Chance

---

[5] Defendant did not offer a copy of Chaplaincy Manual, Policy 09.03 (rev.4) in the instant case, but it was offered in the *Cox* litigation at D.E. 37-12, pp. 1-4.  This document is beneficial in reflecting how the TDCJ adopted, but then discontinued certain policies, based on new medical data as well as staffing considerations.

suffers from two serious infectious diseases, Hepatitis C and Tuberculosis. Because of his communicable diseases, he could not smoke from the communal pipe used during pipe ceremonies, and he sought permission to possess a personal pipe. *Id.*

In response to the *Chance* litigation, on September 8, 2011, a meeting was held with former TDCJ-CID Director Rick Thaler, Chaplaincy Director Bill Pierce, Program Analyst Clint Morris, and other officials to discuss the status of Native American contract chaplains, the possibility of hiring full-time chaplains, and Native American communal pipe services, including medical and sanitation issues, liability releases, protective covers for pipes, frequency of pipe services, costs of pipes, and the increase in Native American adherents over time. (D.E. 46-13, pp. 2-5.). The officials considered the opinion of Dr. Robert Lewis Williams with TDCJ-CID Health Services who stated that Health Services could not condone the communal pipe practice in an institutionalized setting due to the unnecessary risk of the spread of communicable diseases including norovirus, viral hepatitis, tuberculosis, and mononucleosis among the prison population. (D.E. 46-13, pp. 2-3). *See also* Expert Report of Robert J. Eason, TDCJ-CID Deputy Director of Prison and Jail Operations, reporting on medical barriers to communal pipe use and communicable illnesses in a prison setting. (D.E. 46-18, pp. 2-14). After consideration of the evidence, the officials decided that only the Native American Chaplain could smoke the ceremonial pipe at a pipe ceremony. *Id,* at p. 5.

In July 2012, the TDCJ revised Chaplaincy Manual, Policy 09.01 to provide that "[o]nly the Native American chaplain/volunteer is authorized to smoke the pipe used for

the pipe service." (D.E. 46-2, p. 3).  Chaplaincy Manual, Policy 05.01 regarding Religious Devotional Items and Observed Holy Days was also revised. (D.E. 46-7, pp. 3-15).  Chaplaincy Manual, Policy 05.01, Section II.D provides information about "Medicine Bags or Pouches" and states that "[w]earing the bag or pouch is limited to the offender's cell or immediate bunk area in a dorm setting, and at religious services." (D.E. 46-7, p. 5).

### C.   Status of Native American claims in this Court.

Since 2012, five other Native American prisoners incarcerated at the McConnell Unit have filed lawsuits under RLUIPA and the First Amendment, raising claims identical to those raised by Plaintiff herein.  A summary of those cases follows:

(1)   *Davis & Goodman v. Pierce, et al.,* Civil Action No. 2:12-cv-166.

In *Davis,* prisoners Davis and Goodman sought injunctive and declaratory relief by and through Director Stephens sued in his official capacity only, to: (1) allow plaintiffs to smoke a communal pipe and/or a personal pipe during Native American ceremonies; (2) provide a minimum of two pipe ceremonies per month and/or otherwise increase the number of Native American services at the McConnell Unit; (3) allow plaintiffs to grow their hair and/or grow a kouplock; and (4) allow plaintiffs to wear their medicine bags at all times. (*See* Case No. 2:12-cv-166, D.E. 1, 16, 88).  The *Davis* plaintiffs also sued Clint Morris claiming that he personally violated their First Amendment free exercise rights because he failed to advocate for the rights of Native American prisoners such that he was personally liable in his individual capacity for

monetary damages. *Id.*, D.E. 161. The TDCJ presented over 450 pages of summary judgment evidence in that case, and on February 27, 2014, United States Magistrate Judge Janice Ellington entered summary judgment in favor of the TDCJ-CID and dismissed with prejudice the First Amendment and RLUIPA claims of Davis and Goodman. *Id.*, D.E. 158, 159. The *Davis* plaintiffs have appealed that decision to the Fifth Circuit. *See Teddy Davis, et al. v. Billy Pierce, et al.*, Case No. 14-40339.

      (2)    *Legate v. Stephens*, Civil Action No. 2:13-cv-148.

On June 6, 2014, Magistrate Judge Ellington addressed similar claims and evidence in *Legate v. Stephens, et al.*, Case No. 2:13-cv-148. On essentially the same evidence presented in the *Davis* case, Judge Ellington recommended that Legate's First Amendment and RLUIPA claims be dismissed, and on July 21, 2014, this Court adopted the recommendation over Legate's objections and entered final judgment that Legate be denied injunctive relief on his First Amendment and RLUIPA claims. *Id.* at D.E. 43, 47, 48. Legate did not appeal that decision.

      (3)    *Cox v. Stephens, et al.*, Civil Action No. 2:13-cv-151.

Plaintiff Cox filed his original complaint on May 28, 2013, and raised RLUIPA and First Amendment claims concerning his hair length, medicine bag, and a personal prayer pipe. (*See* Case No. 2:13-cv-151, D.E. 1, pp. 6-7). Defendants Stephens and Morris moved for summary judgment, offering much of the same evidence in that case that Defendant Stephens offers now. (*Compare* Case No. 2:13-cv-151, D.E. 37-40, with D.E. 46, pp. 2-3). By Memorandum Opinion and Order entered March 27, 2015, the

Court granted summary judgment in favor of Stephens and Morris and dismissed Cox's claims with prejudice. (D.E. 58, 59). Cox filed a Notice of Appeal (D.E. 61); however, his motion to proceed on appeal *in forma pauperis* (i.f.p.) was denied as taken in bad faith, and he was ordered to pay the $505.00 appellate filing fee over time. (D.E. 67, 71). Cox's appeal is pending in the Fifth Circuit, Case No. 15-41094, but no substantive briefing has been completed because the i.f.p. issue has not been resolved.

(4)     *Cobb v. Stephens, et al.,* Civil Action. No. 2:14-cv-022.

Plaintiff Cobb filed his original complaint against Stephens and Morris on January 21, 2014, and raised RLUIPA and First Amendment claims concerning his hair length, medicine bag, and a personal prayer pipe. (*See* Case No. 2:14-cv-022, D.E. 1, pp. 6-7). The case was stayed on December 12, 2014 (D.E. 18), and there has been no further activity in that action.

## IV.     SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on

file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence, or evaluate the credibility of witnesses. *Id.* Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be

granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence . . . a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V.    DISCUSSION AND ANALYSIS.

### A.    Threshold determinations.

### (1)    The *Chance* case and summary judgment.

Plaintiff argues that there exists a genuine issue of material fact on the issue of least restrictive means because the TDCJ followed more liberal policies in the past regarding the communal pipe, the TDCJ allows women prisoners to grow their hair, and other prisons allow practices that the TDCJ does not. (D.E. 51, pp. 6-12, 19). However, a fact issue is not created simply because the TDCJ had a past policy allowing a now-prohibited activity or because other correctional systems allow an activity that the TDCJ prohibits. *See Chance v. Tex. Dep't of Criminal Justice,* 730 F.3d 404 (5th Cir. 2013). In *Chance,* the plaintiff was seeking access to a sweat lodge, and he offered evidence that a federal correctional facility nearby provided such access. *Id.* at 411. The Fifth Circuit found the practices of other prison systems irrelevant, noting that a comparison of policies ignores "the differences between institutions and all the other factors that might

be more relevant in a given case." *Id. (*citing *Fowler v. Crawford,* 534 F.3d 931, 934 (8th Cir. 2008)). The Fifth Circuit concluded that the mere existence of a prison policy that differs from a past policy or another institution's policy does not necessarily entitle a plaintiff to survive summary judgment on a RLUIPA claim. *Id.* The *Chance* court noted: "That TDCJ or other prisons have tolerated unsafe practices in the past is not a reason to permanently bind it to a dangerous policy."[6] *Id.* at 412. Rather, as will be discussed below, the RLUIPA analysis mandates a case-specific approach when analyzing the issue of least restrictive means on summary judgment. Therefore, Plaintiff does not necessarily survive summary judgment simply because the TDCJ previously had more liberal policies or because other penal institutions provide more services and accommodations to offenders practicing the Native American faith.

### (2) Substantial burden and sincerity of Plaintiff's beliefs.

A second issue often raised at the onset of this analysis is the sincerity of Plaintiff's Native American beliefs. *See Moussazadeh v. TDCJ,* 703 F.3d 781, 790-92 (5th Cir. 2012). Defendant does not challenge the sincerity of Plaintiff's beliefs, but argues only that the policies at issue do not impose a substantial burden on the exercise of his faith. There is no evidence to cast doubt as to the sincerity of Plaintiff's beliefs.

---

[6] Other circuit courts have rejected the adoption of a per se rule or bright-line test in evaluating RLUIPA's least restrictive means issue. *See, e.g., Mays v. Springborn,* 575 F.3d 643, 647 (7th Cir. 2009) (affirming summary judgment dismissing prisoner's free exercise claim where "the only evidence he produced was that the [forbidden items] were allowed at other prisons"); *Spratt v. R.I. Dep't of Corr.,* 482 F.3d 33, 42 (1st Cir. 2007) ("[E]vidence of policies at one prison is not conclusive proof that the same policies would work at another institution.").

## B.     The RLUIPA Standard.

With respect to its protection of institutionalized persons, the RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Under the RLUIPA, the plaintiff bears the burden to prove that the challenged law, regulation, or practice substantially burdens his exercise of religion. Once a plaintiff has made this prima facie showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *Id.,* § 2000cc-2(b); *see Sossamon v. Texas,* 563 U.S. 277, 281 (2011).

Despite RLUIPA's express purpose to protect the religious observances of individualized persons, the statute does not give courts carte blanche to second-guess the reasoned judgments of prison officials. Congress anticipated that courts "would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Cutter v. Wilkinson,* 544 U.S. 709, 716-17 (2005) (quoting 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy on the RLUIPA)). The Supreme Court has cautioned that "[w]e do not read RLUIPA to elevate accommodation of religious

observances over an institution's need to maintain order and safety," and "an accommodation must be measured so that it does not override other significant interests." *Id.* at 722. The Court further instructed:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, context matters in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."

*Id.* at 722-23 (internal quotation marks and citations omitted). However, this deference is not unlimited, and "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the Act's requirements." *Rich v. Sec'y, Fla. Dep't of Corr.,* 716 F.3d 525, 533 (11th Cir. 2013) (internal quotation marks omitted).

### C.   Application of RLUIPA Standard to this Case.

#### (1)   The policies complained of present a substantial burden on Plaintiff's ability to practice his faith.

Under RLUIPA, Plaintiff must initially demonstrate that a government practice imposes a "substantial burden" on his religious exercise. The Court must determine: (1) whether the burdened activity is "religious exercise," and if so, (2) is the burden "substantial"? *Adkins v. Kaspar,* 393 F.3d 559, 567 (5th Cir. 2004). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or

central to, a system of religious beliefs." *Id.*  A government action or regulation creates a substantial burden on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs. *Id.* at 570.

Plaintiff is challenging the TDCJ's grooming policy that prohibits him from growing his hair or a kouplock, the religious objects policy that prohibits him from wearing his medicine bag at all times, and the pipe policy prohibiting him from possessing and smoking his own prayer pipe. (D.E. 1, 51, 57).  If Plaintiff refuses to cut his hair as required by the TDCJ-CID grooming policy, he receives a disciplinary case.  If he fails to let his hair grow, he is dishonoring his traditional beliefs because he cannot mourn properly his loved ones when they die, and he claims that he is subject "to ridicule from his ancestors for cutting [his] hair." (D.E. 51, p. 19).  The TDCJ has objected to long hair arguing that it poses a security risk because it can be used to hide contraband and it exposes the person wearing it to harm.  In addition, searching long hair or a kouplock requires additional staff and time, resources that are in short supply at the TDCJ.

As to the medicine bag, Plaintiff has explained that it contains sacred stones and items believed to protect him from evil spirits, and that is why he wants to wear it at all times, and not just in his housing area and at ceremonies.  (D.E. 51, pp. 14-15).  The TDCJ maintains that it would be cost prohibitive to search the contents of each Native American practitioner's medicine bag thoroughly were he permitted to wear it outside of his cell or cell area.

Plaintiff contends that the purpose of the prayer pipe is to establish a personal relationship with the Creator through a direct dialogue which can only be accomplished by personally inhaling and exhaling the smoke from a pipe. (D.E. 1, p. 9). Plaintiff does not want to smoke a common pipe due to communicable diseases, but wants his own prayer pipe. (D.E. 51, p. 13).

Given the Supreme Court's mandate to examine RLUIPA claims on a fact-specific case-by-case basis, the Court finds that Plaintiff has met his summary judgment burden to establish that the complained-of TDCJ policies and practices place a substantial burden on Plaintiff's religious exercise of his Native American faith.

### (2)     Least restrictive means.

Because Plaintiff has established a substantial burden under RLUIPA, Defendant Stephens must demonstrate that the challenged policies are the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a); *Chance,* 730 F.3d at 410; *see Garner v. Kennedy,* 713 F.3d 237, 241-42 (5th Cir. 2013).

### (a)     *Wearing long hair or a kouplock.*

Robert Eason (Eason), TDCJ-CID Deputy Director of Prison and Jail Operations, testified that the grooming policy impacts the TDCJ's compelling interests in both security and costs. (D.E. 46-18, pp. 23-34). Eason first observes that longer hair would necessarily result in increased searches and increased physical contact between officers and offenders in the "strike zone." *Id.* at 24. Correctional officers are trained to keep an arms-length distance between themselves and offenders, and with an inmate's hair no

longer than the collar, visible inspections are effective and the officer need not touch the inmate. If an inmate is allowed to wear long hair or even a braid, the hair must be searched, thus diverting the attention of the officer from supervising the larger population to focus on a single prisoner. In addition, searching an offender's hair takes time, and time pressures impact the entire unit schedule and the ability to move offenders. (D.E. 46-18, p. 25).

Eason noted that long hair can be used against the offender himself if assaulted or otherwise engaged in a physical confrontation. (D.E. 46-18, p. 29). Long hair or a braid allows another inmate to grab the hair and control the victim. Eason stated that the TDCJ is regularly sued by prisoners who allege failure to protect, and long hair exposes the TDCJ to increased liability. Additionally, long hair would make identification of prisoners, both in and outside of prison (in the event of an escape), more difficult. (D.E. 46-18, pp. 32-34).

Jennifer Gonzales (Gonzales), Assistant Budget Director of the TDCJ Business and Finance Division, calculated that the annual cost to search offenders' hair if all prisoners were permitted to grow their hair past collar length would be approximately $149,405.45. (D.E. 46-16, p. 3).

The Fifth Circuit has effectively foreclosed Plaintiff's RLUIPA claim regarding the grooming policy and his desire to wear long hair. In *Longoria v. Dretke,* 507 F.3d 898 (5th Cir. 2007), the plaintiff, an inmate of Mexican and Native American descent, requested permission to grow his hair because the Great Spirit instructed him to do so.

He sued under RLUIPA and the district court dismissed the lawsuit as frivolous.  On appeal, the Fifth Circuit referenced its decision in *Diaz v. Collins,* 114 F.3d 69 (1997), a case decided under the Religious Freedom Restoration Act (RFRA).  The court held: "Because the test under RLUIPA is sufficiently the same as that previously imposed under RFRA, we hold TDCJ-ID did not violate Longoria's rights by, pursuant to the grooming policy, denying him permission to grow his hair." *Longoria,* 507 F.3d at 901.

In *Thunderhorse v. Pierce,* 364 Fed. Appx. 141 (5th Cir. 2010), the Fifth Circuit again relied on *Diaz* and noted:

> [P]risoners may hide weapons and other contraband in their hair.  114 F.3d at 73.  In addition, requiring short hair makes it more difficult for an escaped prisoner to alter his appearance from photographs that the TDCJ periodically takes of each inmate.  *Id.*  In light of these concerns, we held that "the security interest at stake cannot meaningfully be achieved appropriately by any different or lesser means than hair length standards." *Id.*

364 F. Appx. at 146.  Thus, the Fifth Circuit has determined that even if the grooming policy interferes with a prisoner's right to practice his religion, the policy is the least restrictive means of furthering the TDCJ's compelling interest in security and managing costs.  The evidence presented in this case falls squarely within that reasoning, and Plaintiff fails to establish that a genuine issue of a material fact exists.

Similarly, a kouplock raises the same security concerns and costs as does long hair.  The Fifth Circuit has held that RLUIPA "is not meant to elevate accommodation of religious observances over the institutional need . . . to control costs," and "controlling costs . . . involves compelling governmental interests." *DeMoss v. Crain,* 636 F.3d 145,

154 (5th Cir. 2011) (quoting *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007)).

The TDCJ is not obligated to spend large amounts of money in order for Plaintiff to wear

long hair or a kouplock.   The uncontroverted summary judgment evidence establishes

that allowing long hair or a kouplock could increase the danger to correctional officers

during a search as they must enter the "strike zone," increase the risk of serious injury to

Native American offenders if attacked by other inmates, and lead to increased liability

exposure to the TDCJ.   The grooming policy is the least restrictive means of promoting

the TDCJ's compelling interests in security and costs.

### (b)   *Medicine bags.*

Since 2009, the TDCJ Chaplaincy Department has included medicine bags and

pouches as approved devotional items for offender possession.   (D.E. 46-7, p. 5).

However, "[w]earing the bag or pouch is limited to the offender's cell or immediate bunk

area in a dorm setting, and at religious services." (D.E. 46-7, p. 5).  Plaintiff testified that

he can also wear his medicine bag on his way to and from services.   The policy provides

that "[f]or religious reasons, any inspecting officer shall exercise care while performing a

visual examination of authorized content and shall not touch the bag or its contents or ask

what the items represent, provided contraband is not detected." (D.E. 46-7, p. 5).

Eason testified that if an offender is allowed to wear or move about the prison with

his medicine pouch at all times, he would be at a greater risk of harm from other

offenders, and would also present additional work for security officials:

The ability to quickly and effectively search medicine bags is a basic correctional security need. A bag or pouch which is not transparent and cannot be touched by a correctional officer becomes an ideal place to store contraband, particularly drugs or weapons. A cell phone, or at the very least a SIM card could easily be stored within a medicine bag. Accordingly, TDCJ correctional officers regularly request offenders open and display the contents of the medicine bag during cell searches or when offenders are on their way to religious services. These searches occur most commonly while offenders are en route to and from the weekly religious service. The offender must place the bag in the view of the officer and remove the contents for examination. The time an offender takes to perform this activity is generally longer than it would take an officer to perform the same process. The offender must then replace the contents of the bag.

(D.E. 46-18, p. 18). Eason stated that the search of medicine bags is problematic because offenders are sensitive about the items in the bags being touched or mishandled, and such searches can often lead to correctional officers being sued. (D.E. 46-18, p. 20).

Jennifer Gonzales calculated the costs to search the medicine bags of fifty (50) offenders wearing their medicine bags outside their living areas. The cost is approximately $19.33 a day, or $7,055.45 annually. (D.E. 46-16, p. 2).

Allowing offenders to wear their medicine bags at all times necessarily increases costs and time. Defendant Stephens has established that the TDCJ-CID's policy which limits the wearing of medicine bags to an offender's cell area and to and from services is the least restrictive means in relation to security and cost concerns.

### (c)     *Smoking and/or possessing a pipe.*

After *Yellowquill,* Native American practitioners were permitted to personally smoke the communal pipe or a personal pipe if available. However, several offenders filed grievances complaining about the risk of communicable disease transmission from a

communal pipe.    TDCJ-CID officials sought a medical opinion from Dr. Robert

Williams, Deputy Director of TDCJ's Health Service Division.  *See Chance,* 730 F.3d at

413.  He opined:

> There is no way to share an object designed to be placed in one's mouth
> outside of a clinical setting with enough certainty that diseases cannot be
> transmitted for Health Services to advocate instituting this practice.  If it is
> determined that the [TDCJ's] obligation to allow observance of this
> practice outweighs the [TDCJ's] obligation to prevent spread of infection in
> our institutionalized setting, the [TDCJ] will have to take as effective
> measures as are feasible, but it should be understood that the repercussions
> of this practice may extend beyond the participants since they would
> subsequently expose others with whom they have close contact to any
> disease they contracted from participating in the practice.

(D.E. 46-19, p. 2).  Based on Dr. Williams' recommendation, the TDCJ determined that it

would  no  longer  permit  a  communal  pipe  ceremony.    Rather,  only  the  chaplain

conducting the service would be allowed to smoke the pipe and pray on behalf of those

present.  (D.E. 46-2, p. 3, Chaplaincy Manual, Policy 9.01).  The uncontested evidence

establishes  that  the  change  in  the  communal  pipe  policy  was  based  on  the  TDCJ's

compelling interest in preventing the spread of diseases.

Plaintiff  argues  that  the  TDCJ's  new  pipe  ceremony  is  an  insufficient

accommodation of his religious exercise under RLUIPA because personal participation in

the pipe ceremony is essential.  (D.E. 1, p. 9, D.E. 51, p. 8).  Plaintiff agrees with the

TDCJ's medical concerns,[7] but argues that with respect to the least restrictive means,

---

[7] In his summary judgment response, Plaintiff argues that prison officials were deliberately indifferent to his serious
medical needs when TDCJ policy allowed for a communal pipe, effectively exposing Plaintiff to "serious life
threatening diseases . . ." (D.E. 51, pp. 11-13).  Plaintiff did not raise this Eighth Amendment claim in his
administrative grievances or original complaint and he cannot raise it for the first time in his summary judgment
response.

Native American adherents should be allowed to possess their own personal pipes to avoid communicable disease, and that the pipes could be stored by the prison chaplain in his or her office.

The TDCJ previously considered allowing the use of personal pipes, but concluded that the security risks and associated costs were too great, and that a pipe smoked only by the ceremony leader is the least restrictive means.  As discussed above, on September 8, 2011, several TDCJ officials met to discuss issues concerning Native American ceremonies including medical, sanitation, security, and liability releases.  (D.E. 46-13, pp. 2-5).  It was noted that pipe ceremonies were conducted at the Daniel Unit with a shared pipe, and the tobacco distributed for the pipe ceremony "kept disappearing."  (D.E. 46-13, p. 3).  The group discussed personal pipes for Native American offenders, but concluded that personal pipes would create a security concern and burden, and the cost was too great.  (D.E. 46-13, pp. 4-5).  It was noted that the Cherokee Nation of Texas, the Lakota Nation, and the Apache Nation were not interested in assisting with the cost or donation of personal pipes as they believed the offenders had "lost the right to take of the pipe."  (D.E. 46-13, p. 5).  The group reached a consensus that there be: (1) no communal offender pipes; (2) no offender-owned or possessed pipes; (3) no storage of offender-possessed pipes or pipe herbs by the TDCJ; and (4) one pipe ceremony per month, with smoking to be done only by the volunteer/chaplain.  (D.E. 46-13, p. 5).

Regarding individual pipes, Eason testified: "There are cost, security, and operational barriers to allowing offenders to own and possess their own ceremonial pipes." (D.E. 46-18, p. 10).   With personal or disposable pipes, it would take considerable time to distribute, inventory, and track every Native American believer's pipe for every pipe ceremony.  (D.E. 46-18, pp. 11-12).   The pipes would have to be cataloged and stored, creating additional logistical problems.  Eason further stated that disposable pipes are not a feasible alternative because tobacco is banned in Texas prisons, and is considered valuable contraband.   The TDCJ would have to devote extensive manpower to ensure that none of the pipe ceremony participants stole or hid a pipe. (D.E. 46-18, pp. 11-12).  As to the McConnell Unit in particular, there are severe staff shortages due to the boom in the hydraulic fracturing industry on the Eagle Ford Shale. TDCJ is not able to compete with the salaries associated with that work.  (D.E. 46-18, pp. 21-23).

In *Chance*, the Fifth Circuit considered essentially the same evidence as is now before this Court regarding pipe ceremonies, including Dr. Williams's medical opinion and Eason's costs and security analysis.   730 F.3d at 412-414.   The Fifth Circuit concluded that the TDCJ had met its burden of establishing that the ban on communal and individual pipes, and allowing only the ceremony leader to smoke the pipe at ceremonies was the least restrictive means to conduct pipe ceremonies, and accordingly, not in violation of RLUIPA. *Id.*

In this case, the TDCJ has presented additional and more compelling evidence to support this same conclusion given the documented staff shortages at the McConnell Unit.  In addition, Defendant has offered additional evidence suggesting that, under the Native American faith system, a Native American may be prohibited from partaking in the sacred pipe while in prison.  (D.E. 46-17, p. 5).  Chief Chari Bouse reports that, after researching the issue, she found no tribes that would allow an offender inside the "Iron House" to smoke the sacred ceremonial pipe due to the negative or "dark winds" that preside there.  (D.E. 46-17, p. 5).  Further, Edward Hernandez, the Chaplain for the Estelle Unit in Huntsville, Texas, testified:

> I know of no tribe that believes prayers to the Creator can only be conducted by personally smoking the pipe.  Prayers to the Creator can be sent by praying silently or out loud by an individual or one individual for another.  It is the belief you hold in your heart and not the method in which you worship the Creator that is important.

(D.E. 46-6, p. 4).

Defendant Stephens has offered unrefuted summary judgment evidence that the TDCJ's policy banning personal and communal pipes while allowing a contract chaplain to smoke the ceremonial pipe and to offer the prayers on behalf of the Native American offenders in attendance is the least restrictive means of conducting the sacred pipe ceremonies and does not violate RLUIPA.

**D.    First Amendment.**

Plaintiff's allegations do not establish constitutional violations under the Free Exercise Clause.  The Supreme Court has made it clear that prisoners must be provided

"reasonable opportunities" to exercise their religious beliefs. *Cruz v. Beto*, 405 U.S. 319 (1972) (*per curiam*).  The Court has recognized, however, that limits may be placed on the religious rights that must be afforded to inmates.  In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," and "[w]hen a prison regulation impinges upon the inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.  In determining the reasonableness of a regulation, the trial court should consider the following four factors: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation will have on guards and other inmates and on the allocation of prison resources generally; and (4) the absence of alternatives. *Id.* 89-91.  Shortly after the *Turner* decision, the Supreme Court applied the test to uphold a prison policy that prevented inmates from attending Islamic prayer services in *O'Lone v. Estate of Shabazz*, 482 U.S. 382 (1987).  The Fifth Circuit subsequently added that the Supreme Court neither held any single factor to be dispositive, nor did it require all four factors to be met. *Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 80 (5th Cir. 1992).  The first factor has been held to be controlling in these cases, and the other factors merely provide help in determining whether the connection is logical. *Id.* at 81.  More recently, the Fifth Circuit reaffirmed the basic idea that

rationality is the controlling factor. *Mayfield v. Tex. Dep't of Criminal Justice,* 529 F.3d 599, 607 (5th Cir. 2008).

RLUIPA imposes a more stringent standard than that of the First Amendment. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). Because Plaintiff has not shown a violation under RLUIPA, he has not shown a violation under the Free Exercise Clause. The Fifth Circuit has considered free exercise claims similar to Plaintiff's claims and has rejected them. *See Freeman v. Tex. Dep't of Criminal Justice,* 369 F.3d 860, 862-63 (5th Cir. 2004) (rejecting challenge to policy regarding volunteers); *Baranowski,* 486 F.3d at 121-22 (rejecting challenge to volunteer policy); *Thunderhorse,* 364 F. Appx. at 141 (rejecting requests for items to practice Native American faith, observance of holy days, and pipe ceremony). As shown under the discussion of RLUIPA, there are valid rational connections between the challenged policies and practices and compelling governmental interests. The first factor in the *Turner* analysis is satisfied with respect to all of Plaintiff's claims. Thus, Plaintiff's First Amendment claims against Defendant Stephens are **DISMISSED with prejudice.**

### E.     Plaintiff's responses.

As noted above, this Court has dismissed identical Native American claims based on the same evidence offered in this case. Plaintiff argues in his sur-reply that his claims are distinguishable from those previously dismissed because he is relying on the "*Yellowquill* Compromise Settlement" that authorized Native American practitioners to possess and smoke tobacco because he is claiming that the TDCJ has breached a contract

of which he is a third-party beneficiary. (*See* D.E. 57, pp. 2-13). On December 31, 2014, Plaintiff filed a motion to amend his complaint to raise a breach of third-party contract claim (D.E. 24), and it was denied. Therefore, Plaintiff's breach of contract claim is not properly before the Court. Moreover, even if it were, *Yellowquill* opened the dialogue to address Native American rights within the TDCJ; it did not mandate that any approved practice would not later be challenged or eliminated altogether as long as the decision to do so satisfies RLUIPA and the Constitution.

Plaintiff also argues that the Supreme Court's recent ruling in *Holt v. Hobbs,* 135 S. Ct. 853 (2015), mandates that the TDCJ's grooming policy must fail as to his growing a kouplock. (D.E. 51, pp. 16-20). In *Hobbs*, the Supreme Court unanimously held that an Arkansas prison policy that prohibited a Muslim inmate from growing and wearing a half-inch beard in accordance with his religious beliefs violated RLUIPA, rejecting the prison's no-beard policy based on security and identification arguments. Plaintiff concedes that banning long hair in general is the least restrictive means of maintaining security and costs; however, he argues that his kouplock claim is not foreclosed and that the TDCJ-CID has not presented sufficient evidence regarding the kouplock. In particular, he cites to *Odneal v. Pierce,* Case No. 2:04-cv-454 (S.D. Tex. May 25, 2011), and offers testimony from George Sullivan, an expert in prison management, who testified that a kouplock would not present a security issue or additional time to search. (D.E. 51, p. 21). The Fifth Circuit remanded the *Odneal* case on the kouplock issue, 324

F. Appx. 297 (5th Cir. 2009), and after a two-day trial, the case was dismissed because Odneal was transferred to an out-of-state prison. (Case No. 2:04-cv-454, D.E. 195).

Despite Plaintiff's argument to the contrary, the kouplock issue has been resolved by this Court in *Davis, Legate,* and *Cox,* and now in this action. Defendant Stephens has presented expert opinions based on decades of combined experience of prison officials and correctional officers to establish that searching a kouplock requires an officer to stand in the "strike zone," with an officer placing his hands near an offender's face and through his hair which could be perceived by offenders as more intrusive and "result in a significant rise in incidents between offenders and correctional officers." (D.E. 46-18, pp. 24-25). Eason testified that searching kouplocks would adversely affect staffing as it would require security officers to spend more time searching hair for contraband that otherwise would be spent in supervision of the total offender population. (D.E. 46-18, p. 25). If an offender refused to have his kouplock searched, operations would have to be ceased until he complied, diverting other officers from their assigned positions. (D.E. 46-18, p. 27). If an offender continued to refuse, a use of force would need to be instigated, with all the accompanying documentation. (D.E. 46-18, p. 27). Increased search times have a negative impact on unit activities such as work, education/vocation, chaplaincy services, medical, food service, laundry, industry, commissary, community service, and maintenance. (D.E. 46-18, pp. 28-29).

In addition, the kouplock presents a risk to the inmate who is wearing it because another offender can grab it and gain control of the inmate. (D.E. 46-18, p. 29). The

30

TDCJ could be subject to liability in such a situation.  (D.E. 46-18, p. 29).  Similarly, a kouplock presents a danger for inmates working at jobs in industry with large equipment or machinery.  (D.E. 46-18, pp. 29-30).  For essentially the same reasons long hair has been found to pose a liability, so does the kouplock, and the TDCJ grooming policy seeks to limit the liability as the least restrictive means available.  Plaintiff's *Holt* argument is unpersuasive.

## VI.    CONCLUSION.

The summary judgment evidence establishes that the TDCJ policies challenged by Plaintiff -- the grooming policy, the devotional items policy, and the Native American pipe policy -- all impose substantial burdens on Plaintiff's religious exercise.  However, the TDCJ has established with an abundance of uncontested and unchallenged evidence that the policies are the least restrictive means of furthering the TDCJ's compelling interests in maintaining security and monitoring costs.  Thus, Plaintiff's claims under RLUIPA fail.  Moreover, because the protections offered by the First Amendment are more limited than those extended under RLUIPA, Plaintiff's First Amendment claims also fail.  Accordingly, Defendant Stephen's motion for summary judgment (D.E. 46) is **GRANTED**, and Plaintiff's claims are **DISMISSED with prejudice**.

ORDERED this 9th day of February, 2016.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE